UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
GEORGE ROFAIL                          :          NOT FOR PUBLICATION
                                       :          POSTTRIAL FINDINGS
                                       :          OF FACT AND
                    Plaintiff,         :          CONCLUSIONS OF LAW
                                       :
            -against-                  :          04-CV-2502 (CBA)
                                       :
UNITED STATES OF AMERICA,              :
                                       :
                    Defendant.         :
-----------------------------------------------------------------x

AMON, UNITED STATES DISTRICT JUDGE:

        A six-day bench trial was held before this Court in the above-captioned case, in which

plaintiff seeks damages from defendant for injuries allegedly suffered as a result of defendant's

negligence and the unseaworthy condition of defendant's vessel.  This Court has jurisdiction

over this action pursuant to general maritime law and the Jones Act.  See 46 U.S.C. § 30101; 28

U.S.C. §§ 1346(b)(1), 2674, 2679.

        Having heard all of the evidence in this case, the Court makes the following Findings of

Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52.

## FINDINGS OF FACT

        This Court makes the following Findings of Fact by a preponderance of the evidence.

These facts are premised on this Court's finding that George Rofail's testimony was largely

credible as it pertained to his description of the accident and the injury he suffered to his right

foot aboard the USNS Denebola on January 15, 2003.

## I.    Background

1.      Plaintiff George Rofail was born on May 9, 1961 in Alexandria, Egypt.  (Tr. 144.)

2.     Rofail came to the United States in 1985 and became a citizen in or around 2000. (Tr. 144-45.)

3.     In or about 1992, Rofail obtained a U.S. Coast Guard Merchant Mariner's Document in order to work on U.S. merchant ships. Rofail passed a physical examination and a drug test, and he demonstrated proof of citizenship or legal permanent residence. (Tr. 147-49.)

4.     Rofail joined the Seafarer's International Union ("SIU"), which refers seafarer members to jobs on American flag ships. (Tr. 149, 156.) He began working in entry level positions for American Hawaiian Cruises. (Id.)

5.     Over time, he obtained endorsements on his Coast Guard license. (Tr. 150.) He became qualified to work as an oiler, fireman watertender, machinist, reefer engineer, junior engineer, deck engineer, electrician, tanker assistant, and lifeboatman. (Id.)

6.     From January 1, 1995 through May 1999, Rofail worked on a number of vessels in various capacities, including as a steward, wiper, ordinary seaman, deck maintenance worker, oiler, and pumpman. (Pl.'s Ex. 9.) Rofail's Coast Guard records indicate that he was at sea roughly 92 days in 1993, 106 days in 1994; 118 days in 1995; 138 days in 1996; 146 days in 1997, and 85 days in 1998, for an average of approximately 114 days at sea per year during the years 1993 to 1998. (Id.)

7.     Additionally, tax returns indicate that Rofail's total wages were $12,959 in 1996; $30,325 in 1997 and $32,235 in 1998, for an average of $25,173 per year (Pl.'s Ex. 90A, 90B, 90C.)

## II.    Rofail's Past Injuries

8.      In April 1999, plaintiff was employed by Maritime Overseas Corporation on the
Overseas Washington.  On April 25, 1999, he injured his right shoulder and cervical
spine.  (Tr. 152-53.)  Rofail was declared not fit for duty and eventually underwent
shoulder surgery.  (Tr. 153, 156.)

9.      On September 20, 1999, Rofail applied for Social Security Disability Insurance Benefits
and Supplemental Security Income payments while recovering from his shoulder surgery.
(Tr. 155; Pl.'s Ex. 8.)

10.     On December 7, 2001, Rofail was awarded social security benefits retroactive to
February 16, 2001 as a result of his injuries sustained while working on the Overseas
Washington.  (Pl.'s Ex. 8.)

11.     In December 2001, Rofail took steps to become reinstated for duty in the seafaring
profession pursuant to the Social Security Administration's Trial Work Program.  See 20
C.F.R. § 404.1592; (see also Pl.'s Ex. 5H.)  On December 15, 2001, he was found to be
fit to return to medium duty work, as defined by the United States Department of Labor's
definition of strength levels, by Dr. Don Sanders. (Pl.'s Ex. 5H.)  Rofail reapplied to SIU
to be reinstated as an active member.  He supplied SIU with a narrative report from Dr.
Sanders as well as a medical report and his medical chart from Dr. Sanders' office.  (Tr.
157; 321-26.)

12.     On February 6, 2002 Rofail was provisionally cleared to return to shipping.  He passed a
final physical examination on February 14, 2002, and the SIU cleared him to return to
duty.  (See Pl.'s Ex. 5H.)

### III.     Rofail's Employment on the USNS Denebola

13.     Plaintiff received a job to work as an oiler on the United States vessel, USNS Denebola, on January 9, 2003.  (Tr. 215-16.)  Rofail was informed that his period of employment would be roughly three months, the average length of a voyage.  (Id.; see also Tr. 76-77.)

14.     The USNS Denebola is owned by the United States government.  In 2003, it was operated by American Overseas Corporation ("AMSEA").  (Tr. 215-16.)

15.     Plaintiff joined the ship in Staten Island, New York and began work on January 13, 2003. (Tr. 217.)  At the time Rofail joined the ship, it was in the process of re-crewing to move from Reserve Operating Status ("ROS") to Full Operating Status ("FOS") in anticipation of a trip to the Persian Gulf.  (Tr. 39-40, 76-83).

16.     Plaintiff was assigned to sea watch from 8:00am - 12:00pm and 8:00pm - 12:00am.  (Tr. 219.)

### IV.     The Incident of January 15, 2003

17.     At around 10:30am on January 15, 2003, plaintiff was making his rounds with Adnan Nasser to take a reading of potable water inside the forward house.  (Tr. 228-29.)

18.     Plaintiff left the cargo hold and entered the forward house, passing through a watertight door.  (Tr. 228-30.)  The Court describes the doorway in detail in order to provide the context necessary to understand how Rofail was injured.

19.     The door frame of the watertight door was approximately three feet by five feet, and the door opening was approximately 30 inches wide by 54 inches high.  (Tr. 397.)

20.     At the base of the doorway was a sill that extended to approximately 23.5 inches above the main deck.  (Tr. 397.)  In order to pass through the door, one would have to step over this sill and through the 30 inch by 54 inch opening.  (See Pl.'s Exs. 12D, 12F.)

21.     The doorway itself had a lip around its circumference that served to create a water-tight seal. The horizontal depth of that seal was approximately two inches. In other words, the doorway opening itself was approximately two inches thick. (Tr. 397-98.)

22.     On the far side of the doorway, beyond the lip, was a box-like structure that extended approximately seven inches horizontally into the interior of the forward house. (Tr. 397.)

23.     Beyond this box-like structure, on the inside of the door, was a wooden platform. (Tr. 399.) At the time of the incident, there was no wooden platform on the exterior of the door. (Id.)

24.     The platform on the inside of the door was approximately 36 inches long by 24 inches deep.[1] (Tr. 246-57.)

25.     The platform was placed in the corner where the wall of the forward house met the box-like structure, which in turn rested against the interior of the door frame. (See Pl.'s Ex. 12F.) The platform extended from the wall horizontally across the door frame almost to the edge of the door opening. (Tr. 226-28; see Pl.'s Ex. 12G.)

26.     In summary, to pass through the doorway, one had to step over the sill and across the two inch-deep lip as well as the seven inch-deep box structure, landing on the wooden platform on the far side. In total, one would have to clear nine inches of horizontal distance and a height of 23 and a half inches. (Tr. 399.)

---

[1] The Court credits plaintiff's testimony regarding the dimensions of the platform. The Court notes that defendant disposed of the wooden platform shortly after the accident. Thus there is no physical evidence which contradicts plaintiff's description of the structure. Furthermore, Rofail's testimony is corroborated by the fact that had the platform been approximately the same size as the current platform (as Chief Mate Morway and Captain Garguilo contend), it would have been an obstacle in the path of those coming up and down the stairwell. (Tr. 435-36.) While the current platform is approximately 42", it has a chamfered edge to allow for easy access to the stairwell. (Tr. 402-03.)

27.     On January 15, 2003, Rofail stepped through the doorway with his right foot.  On the far
        side of the doorway, Rofail's foot came down on the right-hand edge of the wooden
        platform, which caused his foot to roll off the edge to the side.  Rofail twisted his foot
        and ankle and fell on his right side, landing on the main deck inside the forward house.
        (Tr. 230-35.)

28.     Based on the foregoing, the Court concludes that the passage through the water-tight door
        to the forward house was not in seaworthy condition.  Because the wooden platform did
        not extend all the way across the door frame, it was not constructed to allow for
        reasonably safe passage through the watertight door.

## V.     Events Following the Injury

29.     After falling, Plaintiff, who claimed that the pain in his foot was unbearable while
        standing, sat on the main deck while Nasser retrieved assistance.  (Tr. 60, 112, 234-36.)
        Chief Mate David Morway and Captain Garguilo arrived on the deck upon hearing of the
        accident.  (Tr. 42, 112. 236.)  Plaintiff related the details of the accident to each of them.
        (Tr. 86, 235-36.)  Morway made record of the accident in the deck log.  (Tr. 74.)

30.     An ambulance was called.  (Tr. 61, 114.)  Upon its arrival, Rofail was administered first
        aid.  He was then lifted on a chair and carried on shore.  (Tr. 75, 237-38.)

31.     Rofail was taken to Staten Island University Hospital.  (Tr. 238.)  While at the hospital,
        he wrote a statement describing the accident.  (Tr. 239.)

32.     At the hospital, doctors took two x-rays of Rofail's foot and ankle.  They found that
        Rofail had broken his fifth metatarsal and suffered an ankle sprain.  A cast was placed on
        Rofail's foot, and he was given crutches.  He was advised to follow up with a physician.
        (Tr. 240, 245; Pl.'s Ex. 5C.)

33. Plaintiff returned to the ship that evening and met the captain and chief mate. He gave the captain his "unfit for duty" letter from the hospital and the written statement he prepared regarding his accident. (Tr. 240, 242.)

## VI. **Plaintiff's Injuries**

34. On January 17, 2003, plaintiff visited Dr. Steven Toulioupolous, an orthopedist. Dr. Toulioupolous recommended conservative treatment and a short leg cast was placed on Rofail. He also prescribed an anti-inflammatory medication. (Tr. 599; Pl.'s Ex. 5Z.)

35. Rofail returned to Dr. Toulioupolous on January 22, 2003. Dr. Toulioupolous found loosening of the cast, tenderness in the base of the fifth metatarsal, decreased swelling of the foot area, and persistent tenderness along the ankle. He diagnosed the injury as a moderate to significant ankle sprain in the right foot. (Tr. 600; Pl.'s Ex. 5Z.)

36. When Rofail visited Dr. Toulioupolous on March 24, 2003, there was no numbness to his toes, nor was there significant pain in his foot. There was no tenderness at the fracture site. An x-ray revealed a healed fracture of the right fifth metatarsal. Dr. Toulioupolous recommended that Rofail continue anti-inflammatory medication and begin weight-bearing and physical therapy. (Tr. 601-03.)

37. On his visit to Toulioupolous on April 28, 2003, Rofail claimed he suffered from stiffness of the ankle, swelling in the ankle and intermittent lateral foot pain. Dr. Toulioupolous found mild to moderate edema and swelling, an ankle effusion, and tenderness. When he performed a stability test on Rofail, Dr. Toulioupolous found a side-to-side difference, which indicated that there was injury to the anterior talofibular ligament. Dr. Toulioupolous requested an MRI of Rofail's ankle and foot, since Rofail's ankle sprain should have healed within 8-12 weeks of his accident. The MRI revealed joint effusion and abnormal signal in the anterior talofibular ligament. (Tr. 603-06.)

38.     As of June 2, 2003, Rofail had residual swelling of his ankle and foot and difficulty

        wearing normal shoes due to the swelling.  He wore a surgical shoe to walk.  (Tr. 607.)

39.     During Rofail's examination on July 2, 2003, Dr. Toulioupolous noted "residual

        swelling, side-to-side difference with the anterior test, no posterior instability."  (Tr. 610-

        11.)  Examination also revealed tenderness and limited motion of the toes.  (Tr. 611-12.)

40.     Dr. Toulioupolous referred Rofail to Dr. Steven Sheskier, an orthopedic surgeon who

        specialized in foot and ankle problems.  Rofail first visited Sheskier on July 25, 2003.

        Dr. Sheskier found that Rofail was "morbidly obese" and walked with a "Trendelenburg

        gait on the right side."  He was also "tender in the anterolateral gutter of the ankle."

        Although his range of motion was normal, he had pain at the base of his fifth metatarsal

        and mild weakness of eversion.  (Tr. 892, 894, 896-97.)

41.     Dr. Sheskier concluded that "the patient was suffering from a chronic right ankle sprain

        with insufficiency or laxity of the lateral ligaments."  He recommended that Rofail

        undergo further tests to see if this finding was significant.  (Tr. 901-02; Pl.'s Ex. 5B.)

42.     Dr. Sheskier performed a talus stress test and found "no demonstrable instability of the

        lateral ankle ligaments."  (Tr. 902-03.)

43.     On September 24, 2003, Dr. Sheskier believed that while there was a probability that

        Rofail had a chronic pain syndrome, it was not due to a mechanical problem with his

        ligaments.  He suggested plaintiff resume care under Dr. Toulioupolous, seek help with a

        pain management doctor, and return to him only if he had persistent problems that

        needed to be reevaluated.  (Tr. 904-05.)

44.     Dr. Sheskier requested that an MRI of the foot and ankle be performed on October 15,

        2003.  He believed that Rofail's other MRI was of poor quality and could not be used for

        diagnostic purposes.  (Tr. 905-06.)  The October MRI revealed a "healed injury" to

plaintiff's anterior talofibular ligament.  The ligament appeared "two to three times the size that it normally is."  (Tr. 905-07, 909.)

45.  As of October 31, 2003, Rofail complained of "persistent pain in his ankle associated with some subjective stiffness."  He walked with a limp and complained of pain in his back.  (Tr. 912.)

46.  At his visit to Dr. Sheskier on January 16, 2004, Rofail complained of ankle pain, stiffness and swelling.  Rofail stated that he walked with a limp.  (Tr. 928.)

47.  Since Rofail's ankle "had not gotten better with time, physical therapy, bracing, and injections," Dr. Sheskier performed arthroscopic surgery upon his ankle and foot on July 29, 2004.  (Tr. 932-33.)  During the surgery, Dr. Sheskier found and removed scar tissue.  An incision in the sinus tarsi area was made and Dr. Sheskier removed inflamed synovium.  (Tr. 939-40.)

48.  Joseph Meade, owner of Meade Investigations, conducted surveillance videos of plaintiff on March 24, 2004, March 26, 2004, March 29, 2004, July 22, 2004, July 26, 2004, and July 6, 2006.  (Tr. 800-01.)  These videos do not cause the Court to reject Rofail's testimony.  Although the video does not show plaintiff to be walking in "excruciating pain," as he told his doctors at the time, it is nonetheless apparent that Rofail was walking with an altered gait.  (Tr. 965.)  Dr. Waller, an orthopedic surgeon who testified for the defense, stated that Rofail told him that he could walk three to four blocks without pain.  (Tr. 830.)  Finally, Rofail was receiving epidural steroidal injections to relieve the pain and inflamation.  In fact, Dr. Touliopolis injected his foot and ankle with cortisone/Kenalog on January 19, 2004, February 23, 2004, March 24, 2004, and June 2, 2004.  (Pl.'s Ex. 5Z.)

49. Following the July 2004 surgery up until January 21, 2005, Rofail's condition in terms of his ankle and subtalar joint improved. (Tr. 943.) Rofail complained of back problems, however, and he was referred to Dr. Andrew Merola. (Tr. 944.)

50. The Court does not credit Rofail's testimony regarding the extent and severity of his back pain or the related testimony provided by Dr. Andrew Merola. Defense witness Dr. Edward Toriello, who examined Rofail and his MRI of July 7, 2003, testified that while Rofail had some degenerative disc changes and disc bulging in L3 through S1 levels of his spine, there was no disc pathology impacting the nerves. (Tr. 767-69.) The testimony of Dr. Maurice Carter also established that when a disc bulge is not impinging on a nerve root, that disc will not produce radiculopathy because it is not irritating the nerve root. (Tr. 692-93.) Moreover, Dr. Andrew Merola testified that it is difficult to determine whether bulging discs are degenerative or caused by trauma. (Tr. 514.) The Court additionally notes that both readings of Rofail's MRI taken on July 7, 2003 were "essentially normal." (Tr. 520-23.)

51. Dr. Sheskier next examined Rofail on September 27, 2006. Dr. Sheskier found that Rofail's calf circumferences and ankle circumferences were equal, that he had normal inversion/eversion and dorsiflexion, and that he was tender in the sinus tarsi. Rofail did not complain of ankle pain at the time. (Tr. 945.)

52. On or about September 21, 2007, Rofail complained of highly localized pain in the sinus tarsi or subtalar region. (Tr. 952.) Rofail was diagnosed with posttraumatic arthritis of the subtalar joint and mild posttraumatic synovitis of the ankle joint. (Pl.'s Ex. 5B.) After conservative treatment failed to produce results, Dr. Sheskier performed subtalar fusion surgery. (Tr. 952.) Two screws were placed from his heel to the talus. Allograph

bone, from a bone bank, was packed into that joint to create a fusion between another joint. (Tr. 953.)

53. Dr. Touliopoulos opined that Rofail's accident on January 15, 2003 was the cause of post-traumatic right ankle instability and post-traumatic right ankle degenerative joint disease. Based on the operative findings of Dr. Sheskier, Dr. Touliopoulos further concluded that the accident caused right foot plantar fasciatus, right foot neuroma and the eventual subtalar fusion. (Tr. 625-27.)

54. Post-surgery, Rofail's foot pain has subsided substantially. Pain persists, however, where the heads of the screws fuse the foot bones. (Tr. 261, 956-58.) Rofail's surgery causes difficulty moving the foot in order to accommodate uneven surfaces. (Tr. 958.)

## CONCLUSIONS OF LAW

### I. Legal Standards

#### A. The Jones Act

"A Jones Act claim is an *in personam* action for a seaman who suffers injury in the course of employment due to negligence of his employer, the vessel owner, or crew members." Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 441 (2001) (citing Plamals v. The Pinar Del Rio, 277 U.S. 151, 155-156 (1928)). The Jones Act creates a negligence cause of action for the seaman against the shipowner and imposes "a duty on the owner to provide a reasonably safe workplace." Oxley v. City of New York, 923 F.2d 22, 25 (2d Cir. 1991). A shipowner has breached its duty to provide its employees with a safe workplace "'if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees.'" Borges v. Seabulk Int'l, Inc., 456 F. Supp. 2d 387, 390 (D. Conn. 2006) (quoting Tufariello v. Long Island R.R. Co., 458 F.3d 80, 87 (2d Cir. 2006)).

In order to prevail on a negligence claim under the Jones Act, the plaintiff must establish, by a preponderance of the evidence, the following elements: (1) that the plaintiff was acting in the course of his employment as a member of the vessel's crew at the time of his injury, (2) that the defendant was the plaintiff's employer, (3) that the defendant was negligent, and (4) that the defendant's negligence caused the plaintiff's injury.  See O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 63-64 (2d Cir. 2002); Diebold v. Moore McCormack Bulk Transp. Lines, Inc., 805 F.2d 55, 58 (2d Cir. 1986); Carmody v. ProNav Ship Mgmt., Inc., 224 F.R.D. 111, 122 (S.D.N.Y. 2004); Williams v. United States, 712 F. Supp. 1132, 1135 (S.D.N.Y. 1989).

A Jones Act plaintiff "'shoulders a lighter burden [for establishing negligence] than [her] counterpart on land would carry.'"  Wills v. Amerada Hess Corp. 379 F.3d 32, 45 (2d Cir. 2004) (alterations in original) (quoting McMillan v. Marine Sulphur Shipping Corp., 607 F.2d 1034, 1039 (1979)); Evans v. United Arab Shipping Co. S.A.G., 4 F.3d 207, 210 (3d Cir.1993) (describing standard of proof for causation and negligence under the Jones Act as "featherweight") (citation omitted).   The rationale for this lighter burden is that seamen litigants enjoy a special status as "'wards of admiralty,' which recognizes the 'relationship of dependence and submission' that emerges between the seaman and the shipowner," and imposes on the shipowner an "'obligation of fostering protection.'"  Saleh v. United States, 849 F. Supp. 886, 891 (S.D.N.Y. 1994) (quoting Cortes v. Baltimore Insular Line, Inc., 287 U.S. 367, 377 (1932)).

A plaintiff's burden of establishing causation, in particular, is "lighter" under the Jones Act than it would be at common law.  Borges, 456 F. Supp. 2d at 390.  A Jones Act plaintiff can satisfy this element by establishing "merely any proof of causation, even the slightest, between the breach of duty and the resulting injury."  Saleh, 849 F.Supp. at 894-95 (emphasis added); see also Oxley, 923 F.2d at 25 ("Under the Jones Act, a plaintiff is entitled to go to the jury if the proofs justify with reason the conclusion that employer negligence played any part, even the

slightest, in producing the injury . . . for which damages are sought."); Fitzgerald v. A.L.
Burbank & Co., 451 F.2d 670, 681 (2d Cir. 1971) (reciting same standard); Sadler v. Moran
Towing Corp., 204 F. Supp. 2d 695, 698 (S.D.N.Y. 2002) (stating that a Jones Act plaintiff "has
a minimal burden on the issue of causation").

## B. Unseaworthiness

"Unseaworthiness is a claim under general maritime law based on the vessel owner's
duty to ensure that the vessel is reasonably fit to be at sea." Lewis, 531 U.S. at 441 (citing
Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960)). Unlike Jones Act liability, a claim
for unseaworthiness under general maritime law "does not require a showing of negligence but is
rather 'a species of liability without fault.'" Saleh, 849 F. Supp. at 893 (quoting Sojak v. Hudson
Waterways Corp., 590 F.2d 53, 54 (2d Cir. 1978)); see also Usner v. Luckenbach Overseas
Corp., 400 U.S. 494, 498 (1971) (stating that "liability based upon unseaworthiness is wholly
distinct from liability based upon negligence"). The Supreme Court has explained that
"unseaworthiness is a condition, and how that condition came into being—whether by
negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries
resulting from it." Usner, 400 U.S. at 498; see also Mitchell, 362 U.S. at 549, 80 S.Ct. at 932
("[T]he decisions of this Court have undeviatingly reflected an understanding that the owner's
duty to furnish a seaworthy ship is . . . completely independent of his duty under the Jones Act to
exercise reasonable care.").

Whether a ship was unseaworthy at the time of an accident is a question of fact. See
Borges v. Seabulk Int'l, Inc., 456 F. Supp. 2d at 392 (D.Conn. 2006) (citing Cook v. American
S.S. Co., 53 F.3d 733, 742 (6th Cir.1995)). The mere fact that the injury occurred on the ship,
without more, is insufficient. In re Marine Sulphur Queen, 460 F.2d at 99; see also Lake v.
Standard Fruit & S S Co., 185 F.2d 354, 356 (2d Cir. 1951) ("[W]e still do not feel that it is

legally incumbent upon the employer to provide an accident-proof ship.").  Instead, a plaintiff must establish that the shipowner breached its duty "to furnish a vessel and appurtenances reasonably fit for their intended use."  <u>Mitchell</u>, 362 U.S. at 550, 80 S.Ct. at 933; <u>see also</u> <u>Saleh</u>, 849 F. Supp. at 893-94.

"'The standard of causation for unseaworthiness is more strict than for a Jones Act claim of negligence.'"  <u>Sadler</u>, 204 F. Supp. 2d at 697 (alteration omitted) (quoting <u>Comeaux v. T.L. James & Co.</u>, 702 F.2d 1023, 1024 (5th Cir. 1983)).  An unseaworthiness claim requires a showing "1) that the unseaworthiness played a substantial part in bringing about or actually causing the injury; and 2) that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness."  <u>Saleh</u>, 849 F.Supp. at 895 (citing <u>Smith v. Trans-world Drilling Co.</u>, 772 F.2d 157, 162 (5th Cir.1985); 1B <u>Benedict on Admiralty</u>, 3-182, 3-184 (7th ed. 1993)).

### C.    **Comparative Negligence**

"Whether an action is brought for Jones Act negligence or for unseaworthiness, the rule of comparative negligence applies."  <u>Jones v. Spentonbush-Red Star Co.</u>, 155 F.3d 587, 596 (2d Cir. 1998).   Under the doctrine of comparative negligence, "recovery is reduced if the plaintiff is found to have been negligent and his negligence contributed to his injury."  <u>Ammar v. United States</u>, 342 F.3d 133, 139 (2d Cir. 2003); <u>see also</u> <u>Johannessen v. Gulf Trading & Transp. Co.</u>, 633 F.2d 653, 655 (2d Cir. 1980) ("Contributory negligence and assumption of the risk are not defenses which bar recovery by a seaman in a Jones Act case. Rather, a comparative negligence standard applies."); <u>Williams v. United States</u>, 712 F.Supp. 1132, 1135 (S.D.N.Y. 1989) ("[I]f a seaman's negligence has contributed to the cause of his injury, his recovery should be reduced proportionately.").  The burden of establishing that plaintiff was negligent falls on the defendant.  <u>Williams</u>, 712 F.Supp. at 1135-36.  "The defendant must show more than that the seaman simply

had knowledge of a hazard; it must show that the seaman 'fail[ed] to adopt safer alternative courses of action,' and the inquiry at trial should thus 'center[ ] on what choices were available to [the Plaintiff] and how he exercised those choices.'"  Ammar, 342 F.3d at 139 (quoting Akermanis v. Sea-Land Service, Inc., 688 F.2d 898, 904 n. 2 (2d Cir.1982)).

D.     **Maintenance and Cure**

"The general maritime law of the United States provides seamen who have become injured while in a ship's service with the right to maintenance and cure."  Wills, 379 F.3d at 52 (citing Ammar, 342 F.3d at 142).  "A claim for maintenance and cure concerns the vessel owner's obligation to provide food, lodging, and medical services to a seaman injured while serving the ship."  Lewis, 531 U.S. at 441 (citing Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 527-28 (1938)).  The concepts of "maintenance" and "cure" are related, and the Second Circuit has explained the difference between them as follows:

> 'Maintenance' refers to a shipowner's duty to provide food and lodging to an injured seaman, comparable to the kind and quality received aboard the ship, while 'cure' refers to 'a shipowner's obligation to provide [such] medical care to such seamen' during the period of recovery or rehabilitation from the illness or injury to the point of maximum recovery.

Wills, 379 F.3d at 52 (internal citations omitted) (quoting Calo v. Ocean Ships, Inc., 57 F.3d 159, 162 (2d Cir.1995)).  These rights arise out of the employment relationship between the seaman and the shipowner and attach regardless of whether the shipowner was negligent and regardless of whether the injury was related to the seaman's job.  See Ammar, 342 F.3d at 142 (discussing maintenance); Calo, 47 F.3d at 162 (discussing cure); see also Reardon v. Cal. Tanker Co., 260 F.2d 369, 372 (2d Cir. 1958) (explaining that claims for maintenance and cure are independent of any claims the seaman might have for negligence or unseaworthiness).  Importantly, the rights to maintenance and cure "exist not only during the voyage but continue after the voyage ends until the disabled seaman has been so far cured as possible."  Reardon, 260

F.2d at 372 (citation omitted); <u>see also</u> <u>Ammar</u>, 342 F.3d at 142 (explaining that the duty to pay maintenance "continues until the seaman has recovered or his condition is declared permanent and incurable"); <u>Calo</u>, 47 F.3d at 162-63 ("[T]he right to cure continues until the seaman fully recovers, or, in other words, only until he [is] so far cured as possible." (internal citation and quotation marks omitted)) .

## II.    **Discussion**

The Court now applies these legal principles to the facts as found.  As stated above, the Court credits Rofail's version of the accident.  Based upon that testimony, this Court concludes that defendant was negligent in failing to provide proper platforms or modifications to facilitate passage through the doorway on the USNS Denebola and breached its duty to provide a safe workplace for plaintiff.  As a result of this negligence, plaintiff fell on January 15, 2003, causing an injury to his right foot.  In view of these findings, the Court additionally concludes that defendant breached its duty to provide plaintiff with a seaworthy passageway through the water-tight door to the forward house.  The absence of a step or platform on the outside of the doorway and the presence of an inadequate platform on the inside of the doorway rendered that part of the vessel unseaworthy.

The Court finds, however, that defendant has carried its burden of demonstrating comparative negligence on the part of Rofail, due to his failure to exercise care in crossing the threshold of the water-tight doorway.  Had Rofail been paying close attention to where he placed his foot on the platform abutting the door, his foot likely would not have rolled off the edge of the platform.  Applying the doctrine of comparative negligence, the Court finds that Rofail was 25% at fault and defendant was 75% at fault.  The Court's conclusions on damages set forth below are subject to this apportionment.

The injuries to Rofail's right foot were proximately caused by the defendant's negligence, as detailed above. The Court credits the testimony of Dr. Steven Toulioupolis and Dr. Steven Sheskiar on the extent of the injuries to Rofail's right foot and the required treatment to alleviate his symptoms. Their testimony, taken together with medical records provided to the Court, demonstrate that Rofail's accident caused him to suffer a right fifth metatarsal fracture, a sprain of the ankle joint and sub-talar joint, and two surgeries consisting of subtalar and ankle debridement and subtalar fusion.

The Court finds that plaintiff has failed to carry his burden of demonstrating that defendant's negligence caused any low back pain Rofail has experienced since January 15, 2003. The testimony of Drs. Toriello, Carter, and Merola, taken together suggest that while Rofail may have exhibited some disc bulging, that bulging may have been degenerative and not necessarily caused by his fall. Moreover, the MRI reports in evidence and the testimony of Dr. Toriello in particular establishes that the bulging discs were not impinging on any nerve root such that Rofail would be likely to experience pain from those discs. The Court finds the results of EMGs administered to be insufficiently persuasive.

The Court additionally finds that the unseaworthy condition of the passage through the relevant water-tight door on the USNS Denebola played a substantial role in bringing about the injury to plaintiff's right foot. Rofail's injury was a reasonably probable consequence of the lack of a step on the outside of the water-tight door, the high threshold that plaintiff was required to cross, and the insufficiently long platform on the inside of the door.

Thus, this Court concludes that the evidence presented at trial establishes by a preponderance of the evidence that the accident occurring on the USNS Denebola caused an injury to plaintiff's right foot. Therefore, defendant is liable for plaintiff's damages.

# DAMAGES

Having made the foregoing findings of fact and conclusions of law, this Court must now address the award of damages. Permissible awards of damages under the Jones Act include compensation for (1) lost earnings, (2) pain and suffering, and (3) medical care. See Williams, 712 F. Supp. at 1136.

## I. Lost Earnings and Benefits

### A. Rofail's Lost Earnings

To determine the award for future lost earnings in a case where the injured plaintiff has been rendered unable to work, courts evaluate three factors: the plaintiff's expected future earning capacity had he not been injured, his life expectancy, and the appropriate discount rate to account for the time value of money. McWeeney v. New York, New Haven & Hartford R.R. Co., 282 F.2d 34, 35 (2d Cir. 1960). In evaluating these factors, "courts have normally utilized an 'oversimplified formula . . . which seeks to determine what the [plaintiff's] earnings would have been had he survived in good health, multiplied by [plaintiff's] work life expectancy with the resultant dollar figure arrived at, then discounted to the present value.'" Earl v. Bouchard Transp. Co., 735 F. Supp. 1167, 1176 (E.D.N.Y. 1990) (citing Conn. Nat'l Bank v. Omi Corp., 733 F. Supp. 14 (S.D.N.Y. 1990) (Carter, J.); Williams, 712 F. Supp. at 1136); accord In re Delmarine, Inc., 520 F. Supp. 2d 422, 445 (E.D.N.Y. 2007).

Plaintiff's economics expert, forensic economist Michael Soudry, conducted an economic loss analysis to determine Rofail's lost earnings depending on the Court's conclusion as to the number of years Rofail would have worked had he not been injured. In making his calculations, Soudry assumed that plaintiff would be employed roughly six months out of every year as both an oiler and a junior engineer, and that plaintiff would have undertaken 3.6 hours per day in overtime, resulting in approximately $33,257 per year in wages. (Tr. 185-90.)

Soudry then deducted 21.8% in income taxes and job maintenance costs, and added the value of plaintiff's fringe benefits as 39% of his earnings based on his union membership.  (Id.; Pl.'s Ex. 79A.)  Soudry also considered the present value of post-trial lost earnings and discounted future earnings accordingly.  Finally, Soudry constructed a chart setting forth Rofail's pre- and post-trial losses depending on the number of years the Court concludes Rofail would have worked had it not been for his injury.  Based upon a retirement age of 65, for example, Soudry calculated that Rofail experienced pre-trial lost earnings of $153,378.00 and post-trial lost earnings of $605,293.00.  The Court credits in part Soudry's analysis of Rofail's lost earnings, with three principal modifications, which are described below.

First, the Court is not persuaded that Rofail would have worked a full six months out of every year.  As an initial matter, the Court finds that plaintiff was likely to be rehired for work on the USNS Denebola for approximately 90 days per year.  According to Chief Mate Morway, an unlicensed worker who completed a voyage on the Denebola would have a right to re-ship on that vessel.  (Tr. 81-82.)  His statement is further corroborated by the union agreement, which states that "[t]he Company shall ensure continuity of employment for all Unlicensed Personnel.  Procedures shall be established which shall provide Unlicensed Personnel who have performed satisfactorily to be re-employed after completion of vacation, illness, etc."  (Pl.'s Ex. 41.)  The USNS Denebola sailed in full operating status for approximately 90 days per year.  (Pl.'s Ex. 34.)

Plaintiff's assertion that he would have worked on other vessels giving him a total of six months of work per year, however, is unsubstantiated.  Coast Guard records from 1993-1998 indicate that plaintiff was employed, on average, 114 days per year.  In addition to the 90 days a year that plaintiff would have worked on the USNS Denebola, the Court finds that he would have been employed on other vessels for another 24 days a year, resulting in a total time at sea of

114 days per year. Defendants have not challenged plaintiff's assertion that he would have worked 3.6 hours per day in overtime, and the Court finds this assertion to be adequately supported by the record.

Second, the Court finds unpersuasive Rofail's claim that he would have worked as a junior engineer. Although plaintiff alleges that his future earnings should be based on the salary of a junior engineer, he has not held any prior jobs as a junior engineer. Although he is certified to work in that position, plaintiff has failed to meet his burden of proof to show he would have been hired as an unlicensed junior engineer with another ship for three months of year.

Finally, the Court concludes that Rofail would have worked until his statistical retirement age of 60.7. Although plaintiff argues that he would have worked until he was eligible for full Social Security benefits at age 67, it is unlikely that Rofail would have worked for that length of time in view of the injuries to his shoulder and cervical spine on April 25, 1999. Although those injuries improved to some degree such that Rofail was able to return to medium duty work, the Court concludes that his injuries would have impacted the length of his working life.

### B.    Mitigation of Damages

In determining the amount of compensatory damages to which the discharged seaman is entitled, the Court must also consider the seaman's duty to mitigate his losses by seeking new employment. Smith v. Atlas Off-Shore Boat Serv., Inc., 653 F.2d 1057, 1064 (5th Cir. 1981); Earl v. Bouchard Transp. Co., 735 F. Supp. 1167, 1173 (E.D.N.Y. 1990) (citations omitted). "The burden of showing that a plaintiff unreasonably failed to minimize damages rests with the wrongdoer." Williams, 712 F. Supp. at 1136, 1139 (citing Fed. Ins. Co. v. Sabine Towing & Transp. Co., 783 F.2d 347, 350 (2d Cir. 1986).

The Court finds that defendant has not met its burden in demonstrating that Rofail failed to mitigate his losses by seeking new employment. The only evidence before this Court on plaintiff's current employability is defense counsel's cross-examination of Mr. Soudry on his damages calculations, which were based on an assumption that Rofail was unemployable. Defense counsel has offered no testimony regarding the kinds of work Rofail would be qualified to undertake or the amounts that should be offset from any damages award. Accordingly, the Court does not find that plaintiff failed to mitigate his damages through re-employment.

### C. Deduction of Social Security Disability and Medicare Benefits

As described above, Rofail applied for and received Social Security Disability Insurance Benefits as a result of his injuries. Defendant claims that the amount of Social Security Disability benefits Rofail received should be deducted from his damages award for lost earnings. Plaintiff argues that the disability benefits are a collateral source and should not be deducted.

The collateral source doctrine "is an established exception to the general rule that damages in a negligence action must be compensatory." Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308, 316 (2d Cir. 1964). Under this exception, "a wrongdoer is not permitted to reduce a plaintiff's recovery because of benefits which the latter may have received from another source." Id.; see also Davis v. Odeco, 18 F.3d 1237, 1243 (5th Cir. 1994). The collateral source law is found in the common law of many states,[2] and it "applies to cases governed by federal law, including cases arising out of the Jones Act." King v. City of New York, No. 06 Civ. 6516, 2007 WL 1711769, at *1 (S.D.N.Y. June 13, 2007) (citing Eichel v. New York Central R.R. Co., 375 U.S. 253, 254 (1963) (federal law); Hartnett v. Reiss S.S. Co., 421 F.2d 1011, 1016 (2d Cir.

---

[2] New York has substantially modified the collateral source rule by statute. See N.Y. CPLR § 4545; Turnbull v. USAir, Inc., 133 F.3d 184, 186 (2d Cir. 1998).

1970) (federal law); <u>Tipton v. Socony Mobil Oil Co.</u>, 375 U.S. 34, 35 (1963) (per curiam) (Jones

Act)); <u>see also</u> <u>Odeco</u>, 18 F.3d at 1243 n.20 ("The collateral source rule is plainly applicable in

Jones Act negligence cases." (internal quotation marks omitted)).  In cases brought under the

Jones Act and general maritime law, federal common law governs the application of the

collateral source rule.  <u>See</u> <u>Blake v. Del. & Hudson Ry. Co.</u>, 484 F.2d 204, 205-06 (2d Cir.

1973); <u>Ebert v. City of New York</u>, No. 04 Civ. 9971, 2006 WL 3627103, at *2 (June 26, 2006).

     Historically, the collateral source rule arose out of a fear that juries would factor in

evidence that a plaintiff was receiving collateral compensation when determining the defendant's

tort liability.  <u>See</u> <u>Phillips v. Western Co. of North America</u>, 953 F.2d 923, 929 (5th Cir. 1992)

(collecting cases).  Consideration of collateral source payments would risk unfairly penalizing

plaintiffs for having the prudence to seek third-party sources of compensation.  <u>See</u> <u>Odeco</u>, 18

F.3d at 1243 n.21.  "The collateral source rule addresses this potential bias and effectively forces

the tortfeasor to absorb the total cost of the resulting harm."  <u>King</u>, 2007 WL 1711769, at *1.

     This rationale applies with less force when the government is both the benefits provider

and the tortfeasor.  <u>Id.</u>; <u>see also</u> <u>Odeco</u>, 18 F.3d at 1244.  In such cases, courts look at both the

character of the benefits received and the source of those benefits.  If the benefit is in the nature

of a fringe benefit, rather than an effort on the part of the tortfeasor to offset liability, it is

generally considered collateral and not deducted from lost earnings.  <u>See, e.g.</u>, <u>Haughton v.

Blackship, Inc.</u>, 462 F.2d 788, 791 (5th Cir. 1972) ("[W]here the employer-tortfeasor makes

payment directly or indirectly into a fund established for an independent reason, or where such

payment by the employer should be considered in the nature of fringe benefit or deferred

compensation, the employer should not be entitled to benefit by setting off such income in

mitigation of his responsibility as a tortfeasor.").  Similarly, where the benefits are paid out of a

special fund or designated government benefits program, rather than general government revenues, courts generally decline to deduct them from a damages award. <u>King</u>, 2007 WL 1711769, at *2. This is particularly true when the plaintiff has contributed to the special fund. <u>Siverson v. United States</u>, 710 F.2d 557, 560 (9th Cir. 1983) ("Courts distinguish between those benefits that come from unfunded general revenues of the United States (deductible) and those that come from a special fund supplied <u>in part</u> by the beneficiary or a relative upon whom the beneficiary is dependent (nondeductible)." (internal quotation marks omitted)).

Following these principles, many courts have concluded that Social Security disability benefits and funds from other similar government programs do not offset tort liability. <u>See Smith v. United States</u>, 587 F.2d 1013 (3d Cir. 1978) (declining to deduct Social Security survivor benefits paid to widow and children from widow's damage award against government); <u>Steckler v. United States</u>, 549 F.2d 1372, 1379 (10th Cir. 1977) (remanding on issue but stating that Social Security disability benefits are "[l]ogically" collateral); <u>see also</u> <u>Berg v. United States</u>, 806 F.2d 978, 985-86 (10th Cir. 1986) (holding that Medicare payments were collateral source because, like Social Security disability benefits, they were paid out of a "special fund that is separate and distinct from general government revenues" and to which plaintiff had contributed); <u>Silverson</u>, 710 F.2d at 560 (Medicare benefits not deductible); <u>United States v. Price</u>, 288 F.2d 448 (4th Cir. 1961) (Civil Service Retirement benefits not deductible); <u>United States v. Brooks</u>, 176 F.2d 482 (4th Cir. 1949) (National Service Life Insurance Policy benefits not deductible). More recently, two district courts in this Circuit held that benefits received under New York City disability pension funds are not deductible from awards for lost earnings. In <u>Ebert</u>, a personal injury case arising under the Jones Act and general maritime law, the court

declined to deduct disability benefits received from the New York City Police Pension Fund, stating:

> [T]he Pension very clearly does not represent an effort on the part of defendant to provide indemnification for itself in the event of its liability to police officers injured in the line of duty. Rather, it reflects the public's concern for the welfare of police officers injured in the line of duty. It's about taking care of your fallen soldiers.

2006 WL 3627103, at *4 (internal quotation marks and citations omitted). Similarly, the court in King held that benefits should not be deducted because the "City Legislature enacted the Pension out of a moral obligation, and its benefits are available regardless of whether the City is the tortfeasor." 2007 WL 1711769, at *2. Noting that "[m]any courts in similar circumstances have concluded that social security benefits, insurance benefits, and other special funds do not serve as offsets," the court concluded that the benefits were a collateral source because they were "intended for the general welfare of New York City firefighters and police officers," not as an offset against liability. Id.

Like the pension benefits at issue in King and Ebert, Social Security disability benefits are available to injured persons regardless of whether their injuries were the result of the government's negligence. In addition, they are paid out of a special fund, not out of general government revenues. See 42 U.S.C. § 401; Smith, 587 F.2d at 1016 ("Social Security benefits are funded almost entirely from employee and employer contributions."). Accordingly, the Court concludes that plaintiff's Social Security disability benefits are not deductible from his award for lost earnings.

For the same reasons, the Court concludes that plaintiff's Medicare benefits are not deductible from his award for lost earnings. See Berg, 806 F.2d at 984-86 (holding that Medicare benefits are a non-deductible collateral source); Silverson, 710 F.2d at 560 (same).

## II.     Pain and Suffering and Loss of Life's Pleasures

An award for pain and suffering is divided into damages for past pain and suffering and damages for future pain and suffering. See Oliveri v. Delta S.S. Lines, 849 F.2d 742, 749-51 (2d Cir. 1988); Gretchen v. United States, 618 F.2d 177, 180 (2d Cir. 1980). In addition, the Court is to consider a plaintiff's loss of life's pleasures, but the Second Circuit has instructed that "[d]istrict courts . . . should not be unduly preoccupied with the unimportant distinction between 'and' and 'including'—that is, the issue of whether or not loss of life's pleasures are 'included' in pain and suffering" or whether they should be computed separately. Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1327 (2d Cir. 1990). Finally, damages for future pain and suffering are discounted to the present value. Oliveri, 849 F.2d at 751. In contrast to the method employed for discounting the loss of future earnings, however, discounting future pain and suffering damages may be undertaken "without any precise mathematical adjustments," so long as "the time value of money [is] 'take[n] into account.'" Id. (second alteration in original) (quoting Metz v. United Techs. Corp., 754 F.2d 63, 68 n.3 (2d Cir. 1985)).

As a result of his fall on the USNS Denebola, plaintiff suffered a serious injury to his foot. As described above, evidence was presented at trial that plaintiff suffered severe pain in his foot and ankle in connection with these injuries. Rofail testified that he was in such pain after the accident that he had no choice but to sit on the deck until medical help arrived. His account is corroborated by Morway and Garguilo. Furthermore, Dr. Sheskier testified that he based his decision to conduct arthroscopic surgery because Rofail "was walking with excruciating pain using a cane, walking with difficulty, with heavy limping, and very poor spinal posture." (Tr. 967.) This testimonial evidence is corroborated by the fact that Rofail underwent two considerable surgical procedures seeking relief from his pain.

In setting the amount of damages amount for Rofail's pain and suffering, it is helpful to review precedents. In <u>Earl v. Bouchard Transp. Co.</u>, 735 F. Supp. 1167 (E.D.N.Y. 1990), <u>aff'd</u> 917 F.2d 1320 (2d Cir. 1990), the plaintiff severely sprained his ankle while falling from the bulwark of a tugboat. The court awarded the plaintiff damages for past pain and suffering in the amount of $100,000 and future pain and suffering in the amount of $280,000. <u>Id.</u> at 1177. Similarly, in <u>Calo v. Ocean Ships, Inc.</u>, 57 F.3d 159 (2d Cir. 1995) the Second Circuit affirmed an award of $100,000 for past pain and suffering and $225,000 for future pain and suffering for a plaintiff who slipped on the ladder of a ship, fell, and seriously injured his back and right knee. <u>Id.</u> at 160-62. In this case, given the amount of pain Rofail experienced when he was injured, and in the years following his injury, the Court considers an award of $150,000 for past pain and suffering to be appropriate.[3]

With regard to future pain and suffering, the Court notes that while plaintiff's ankle pain has subsided significantly, he still suffers pain where the bones of his foot were fused together and has difficulty accommodating uneven ground surfaces. (Tr. 958.) Therefore, taking into account the time value of money, the Court awards an additional amount of $200,000 for future pain and suffering. In making this award, the Court notes that the parties have not presented evidence regarding plaintiff's life expectancy. The Court takes judicial notice that the average life expectancy for a 47-year old male living in the United States is approximately 31.4 years. <u>See</u> National Vital Statistics Reports, Vol. 56, No. 9, Table 2 (Dec. 28, 2007), <u>available at</u> http://www.cdc.gov/nchs/products/nvsr.htm.

---

[3] Based on the liability findings, these pain and suffering awards are to be reduced by 25% to account for comparative negligence.

### III.    Maintenance and Cure

Under general maritime law, plaintiff is entitled to an award for maintenance and cure. The collective bargaining agreement governing Rofail's former employment sets the maintenance rate at $8 per day. The Second Circuit has held that courts must respect the limitations collective bargaining agreements impose on maintenance and cure. Ammar, 342 F.3d at 143 (2d Cir. 2003); see also Marcic v. Reinauer Transp. Co., 397 F.3d 120, 131 (2d Cir. 2005) ("The Court in Ammar joined the majority of Circuit Courts to have considered the matter in holding that while the right to maintenance may not be waived by contract, seamen may, through union-negotiated CBAs, limit the right to maintenance to which they are entitled, and courts must respect such limitations."). As discussed above, "the rights to maintenance and cure exist not only during the voyage but continue after the voyage ends until the disabled seaman has been so far cured as possible." Reardon v. Cal Tanker Co, 260 F.2d 369, 372 (2d Cir. 1958) (citation omitted); see also Staffer v. Bouchard Transp. Co., 878 F.2d 638, 644 (2d Cir. 1989) ("Maintenance and cure, a right under general maritime law, gives to a seaman, injured in the service of a ship, wages to the end of the voyage as well as subsistence, lodging and care to the point where the maximum cure attainable has been reached.").

The Court finds that Rofail had not reached maximum medical cure by the time of trial. Dr. Sheskier testified that Rofail may need further surgery to remove the screws that were placed in his foot. (Tr. 957-58.) The Court credits this testimony. Subsequent to the trial, plaintiff reports that Rofail underwent such surgery, and the screws were removed. (Report of Dr. Steven Sheskier, Sept. 26, 2008 [DE 93].) On December 29, 2008, Rofail went for a follow-up appointment with Dr. Sheskier, who reported following their meeting that Rofail has now reached maximum medical cure. (Report of Dr. Steven Sheskier, Dec. 29, 2008.) The Court

construes Rofail's post-trial submissions as an admission that he reached maximum medical cure as of December 29, 2008. Accordingly, the Court awards Rofail maintenance and cure of $8 per day from May 4, 2004, when AMSEA cut off his payments, through December 29, 2008.

## IV.    **Interest and Costs**

In an action brought under general maritime law, a plaintiff is normally entitled to pre-judgment interest on loss of earnings. See Magee v. U.S. Lines, Inc., 976 F.2d 821, 822-23 (2d Cir. 1992); McCrann v. U.S. Lines, Inc., 803 F.2d 771, 773-74 (2d Cir. 1986); Indep. Bulk Transp., Inc. v. Vessel Moriania Abaco, 676 F.2d 23, 25 (2d Cir. 1982). The Court awards interest at a rate based on the average rate of return on one-year Treasury bills from the date of Rofail's injury, January 15, 2003, through the entry of judgment. See, e.g., Thomas v. iStar Financial, Inc., 508 F. Supp. 2d 252, 254 (S.D.N.Y. 2007); see also 28 U.S.C. § 1961(a).

The Court does not award attorneys fees or costs because there has been no showing of bad faith on the part of defendants. See Ingersoll Milling Mach. Co. v. M/V Bodena, 829 F.2d 293, 309 (2d Cir. 1987) ("[T]he general rule is that the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith."); Seguros Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855, 861-62 (2d Cir. 1985).

**CONCLUSION**

For the foregoing reasons, the Court find that plaintiff's injury was caused by defendant's negligence and the unseaworthiness of the USNS Denebola. The Court further determines that plaintiff's negligence contributed to the injury. The apportionment of liability for the injury was 75% defendant, 25% plaintiff. Finally, the Court has made the following determinations as to damages:

1.      Plaintiff's lost earnings should be based entirely on of the salary of an oiler, not a junior engineer.

2.      Plaintiff would have worked as an oiler for a total of 114 days per year, with 3.6 hours per day in overtime.

3.      Plaintiff would have worked until the age of 60.7.

4.      There is no deduction for social security or medicare benefits.

5.      Plaintiff is entitled to damages for past pain and suffering in the amount of $150,000 and future pain and suffering in the amount of $200,000.

6.      The above damages calculations are subject to a 25% deduction due to Rofail's comparative negligence.

7.      Plaintiff is entitled to maintenance and cure of $8 per day from May 4, 2004 through December 29, 2008.

8.      Plaintiff is entitled to pre-judgment interest on lost earnings as set forth above.

Because the Court has adopted different conclusions from either party concerning the proper basis for a damages award, the Court considers it necessary to have the parties propose a computation consistent with these conclusions in the first instance, so that any disputes regarding those computations can be resolved. Within 30 days from the date of this order, counsel for plaintiff is directed to provide a proposed Judgment on damages consistent with this Opinion. This proposed Judgment should reflect the appropriate calculations for a Judgment that would be entered 30 days after plaintiff's submission. Plaintiff shall accompany the proposed Judgment with an affidavit setting forth the calculations he used to arrive at the amount of damages. In setting forth the salary of an oiler, plaintiff is directed to cite to the exhibits and testimony in the record that support his position. The proposed calculations should be based upon this Court's findings and the actual date of trial.[4] Defendant shall file a letter either agreeing with the

---

[4] Dr. Soudry's calculations were based on an assumed trial date of March 1, 2007. (Pl.'s Ex. 79A.) Trial began on June 18, 2008 and concluded on June 25, 2008.

proposed damages calculations or setting forth any disagreements it has with respect to those calculations, based upon this Court's findings, within fifteen (15) days after plaintiff files the proposed Judgment.

SO ORDERED.

Dated: Brooklyn, New York
June 18, 2009

Carol Bagley Amon
United States District Judge